All right. The notes that I've received is that there's going to be one person arguing for the appellant. Is that correct? Okay. And then it looks like we've got two people arguing on the appellee side. And I'll talk to you about that when you come to the podium. All right. Each side has 20 minutes. Are we going to get a report on it? That what? Are we going to get a status report? Do you want to get that during your argument, or how do you want to get it? I think one of the things the parties were asked to do, we're going to have argument today, but also a status report. Does someone want to give a status report? Okay. How long are we going to talk on that? I'll talk maybe 30 seconds. Okay. Let's do that off the clock then. So first it's, is it Mr. Buse? John Busey. Oh, John Busey. Okay. Why don't you give us your status report? In February, we had learned that very recently the Nevada State Engineer had issued a series of decisions in a water rights protest that we felt was relevant to this case. We, at that point, initiated discussions with the government. We brought that to their attention, and that evolved into settlement discussions, which I'll let Ms. Roberts. So those settlement discussions, you're doing them privately? You haven't used the circuit mediators? We have not used the circuit mediators. We have informed the circuit mediators, however. Yeah. And, Your Honor, we have an agreement. And your name is? Nina Roberts, and on behalf of the United States. We have an agreement in principle and are optimistic that we'll settle this case. Do you need our mediators? Not at the moment, Your Honor, but we may employ their services if necessary. All right. When would you hope to, you know, part of the reason is we're composing this, you know, we all come from different places, and so it's really hard to recompose a panel, and also my personal view is I guess I probably don't give lawyers all the credit that they're due, or maybe more in the sense that having your feet to the fire and knowing that we're prepared to go forward, I think, motivates people to not open-endedly, you know, that we want to put sort of time frame on this, and that's why we wanted to do the argument today, and then certainly, you know, we don't want to stand in the way of settling, but when do you think that you might have some, when would we appropriately ask for a report on settlement? I believe we'll have one within the coming month or so, Your Honor. I mean, you never know with these things. The senior Department of Justice officials have to approve it. They have their own timeline, but I think within the coming weeks we can expect it. So this is before the Department for approval? No, Your Honor. It's not. We have an agreement in principle. We haven't fleshed out the details. All right. So probably realistically that if we'll have argument and we could ask for a status report within 60 days. That's not very reasonable. We could defer submission. We could defer submission, ask for the status report, and then if at that point there isn't a settlement, then we'll submit it and we'll decide it. But that way we'll have everything that we need in order to do that. Okay? All right. Mr. Busey, you're back on. Thank you. Good morning. John Busey. Busey, I'm sorry. That's like Gary Busey. I'm sorry. He probably wouldn't take that as a compliment. Sorry. I'll take it as it is. We filed this case challenging a biological opinion that we thought was much like many other biological opinions that we've dealt with in our practice. But since then it seems to have developed something of an existential crisis. According to the Federal Defendant's position, it doesn't do anything. It relates to a Federal action, the government's participation in a memorandum of agreement, that they say doesn't do anything. Well, the thing is, though, that you lost below basically on a standing issue, and you don't even talk about that in your opening brief. Like, oh, never mind. And Federal courts always care about standing. We understand. We did take, and perhaps mistakenly, the district court's decision on standing to relate primarily to the issues that we didn't press on appeal. Well, but the court wouldn't hear your ESA issue if you had to. I mean, Article III courts, you always have to have standing on everything. That's correct. And we feel that based on our challenge to the biological opinion, we have demonstrated the necessary elements under the Supreme Court standard in Defenders of Wildlife v. Lujan. I don't think there's any dispute about injury in this case. The dispute involves whether we have shown causation and whether we have shown redressability, two somewhat interrelated concepts, at least as they're applied in this instance. The biological opinion we challenged because we feel it did do something. At its onset, it stated on its first page that the Federal action in this case, that the Fish and Wildlife Service believed it would adversely affect the moapidace. The biological opinion went on to make a determination that there would be no jeopardy as a result of this Federal action. And it made that determination based on a set of conservation measures which were adopted. That's what we're challenging here. I think we have, you know, obviously there's an underlying action, this pumping of groundwater. That's the ultimate cause. But you're challenging what? The determination of no jeopardy? We're challenging, among other things, the determination of no jeopardy. Yes. Hasn't this, but the pumping's already happened, right? The pumping has happened, but the memorandum of agreement governs more than the pumping. Well, there's a second tier. Is that why this isn't moot? Or what's? It's not moot. Although the pump test has concluded, the groundwater pumping that is the subject of this memorandum of agreement continues up to 16,100 acre feet per year, I believe. So that's. It's got to keep going. The memorandum of agreement, in other words, doesn't just deal with the pump test. It deals with this ongoing groundwater pumping. The memorandum doesn't authorize the pumping, does it? The memorandum does not authorize the pumping. And if, in some cases, I think we led the district court to think that that's what our argument was. And it almost comes down to a semantic dispute at this point. I don't think we could say that the memorandum authorizes the pumping. The pumping is a matter of Nevada state water rights and the state engineer's decisions. But if we say the memorandum of agreement allows the pumping, I think that's a different matter. In a real sense, it does allow the pumping. The federal government placed its imprimatur on the memorandum of agreement. It says we will not assert the federal government's state water right in this process. Now, there's some dispute about the effect of that assertion, but very clearly the government says we will not. So you're arguing that the government's involved because of state action or they authorized it and their party? Is that your argument? The government is involved because of the fish, which is the subject of this case, the Moapa dace, a federally endangered species. But to me, the memorandum of understanding is about preservation of these species that you're complaining will be hurt. Correct. The memorandum does have a conservation purpose. But the problem that we see is that it sets these in-stream flow triggers that we believe are insufficient to achieve the federal government's duty under the Endangered Species Act. That's the key. Now, would the pumping occur without the memorandum? That's speculation. Our view is that we have a different world without the memorandum in any case. We don't know what that world would look like, but it would be a different world. Mr. Busse, I'm at Judge Reed's opinion here at page 11. It's excerpts of the record at 15. Defendants have provided unrebutted evidence that the groundwater pumping itself is a consequence of the state engineer's order and not a result of the MOA. Is that clearly an erroneous finding? I don't think that's an erroneous finding. However, when I put things in terms of does the federal government's participation in the memorandum allow the pumping, I think that's a different matter. They allow the pumping in the sense that they allow it to occur without the assertion of their federal water right, and they allow it to occur without a finding that the action will jeopardize the existence of the Moapa days. In that sense, they're allowing it. I think that's perhaps that was a semantic distinction in the district court's mind, but it's not one in ours. It's a very real distinction. Well, sometimes you can want to have something to say, but sometimes you don't get to sit at every table. So why do you get to make these claims? Well, we want something. It's true, but we also believe that if the Endangered Species Act were adhered to, that things would have been different with this memorandum of agreement, that the triggers, the inflow triggers would have been biologically and scientifically based rather than the product of negotiation. It's not that there's anything wrong with negotiation, and I don't want to be painted into that position by the government or the interveners. Compromise is good in this situation, but that compromise ultimately, the compromise must be based on a Fish and Wildlife Service position that's underpinned by the minimum standards of the Endangered Species Act and the best available science. Who owns the land that's involved here, where this water is? There's both publicly owned and privately owned land, as I understand it, Your Honor. The central portions of the Moapa daises habitat, the uppermost elevation portions are within the National Wildlife Refuge. That's Federal land. Close, interrelated and closely connected with that are privately owned or non-Federal, at least non-Federally owned lands. So for the future, if this non-Federally owned land, somebody proposes to do something on it, what is the effect of this no-jeopardy determination here? Well, this is a programmatic biological opinion, so it does have effect for future actions. The Federal defendants have argued, well, it's not binding on those lower-tier actions, but I think it's not quite as simple as that, because this upper tier,  the programmatic biological opinion has made the determination that with these in-stream flow triggers and other conservation measures, there will be no jeopardy. Now, it could make a different determination, but on what different facts? Those are going to be the facts as they find them for subsequent determination. So this is the one. This is the programmatic determination. So whatever is specifically determined in the future, there will be an analysis that will be tiered to this one that says the bill belongs? Will be tiered from this. It doesn't absolutely dictate precisely the same analysis or same conclusion, but this determination that this series of conservation measures, including the flow triggers, is adequate, has already been made. Well, have you challenged any of the tiered biological opinions? We have not. Is there anything to stop you from doing so? There may or may not be. It will depend on the time that those biological opinions were issued and the relevant statutes of limitations. But we chose, I think, reasonably at the time, perhaps less so in retrospect, to challenge the upper tier biological opinion, the one that does, in our view, govern the others. That was the root or the source of what we believed to be the problem. That's why we challenged it. So you're concerned about the long-term effect of this? The long-term effect as it's applied to other future projects, but as it's applied here, because this MOA, this memorandum of agreement, did apply to the existing pumping situation. It set these flow triggers for what's happening now and not just the pump test. So that's why we pursued it at this point. Did I mention rebuttal time, and is it too late? You didn't. Would you like to reserve at this point? Five minutes would be great, Your Honor. All right. Well, then you're at ten and a half, so. I wanted to touch on the issue of the incidental take statement or the lack of one in this biological opinion. That relates to some of the problems with the lack. Does the MOU or biological opinion authorize any taking of the Moapidase? The biological opinion does not authorize. It does not set a take limit. It does not authorize take. All right. Does the MOU authorize? It does not. Okay. The biological opinion does conclude that Moapidase and their habitat will be harmed at flow levels that can be contemplated that may or will occur under the groundwater pumping described in the memorandum. That's why we believe that an incidental take statement should have been included. There was a determination of no jeopardy. There was a further determination that harm to the species would occur. We have this Center for Biological Diversity versus Fish and Wildlife Service case involving the forest plans. It says, well, if the service can make a no-jeopardy determination, and if it can determine that harm is occurring to the species, then it has to set an incidental – then it has to provide an incidental take statement. It has to quantify that take. And that quantification serves an important purpose because that provides a clear trigger for reinitiation of consultation, a trigger that's lacking in the current biological opinion.  So you can reserve the balance for rebuttal. Yes, thank you. Thank you. All right. So before we start the clock, you're Nina Robertson from the federal government, is that correct? That's correct. And you were going to take 16 minutes, and you're going to leave four minutes to Mr. Feldman that's representing the Water Authority, is that correct? That's correct, yes. Okay. So I will make sure you get your four minutes. All right. You may proceed. May it please the Court, Nina Robertson, on behalf of the United States, and with me at counsel's table is Mr. Feldman, as well as Mr. Harama, who represents Coyote Spring Investment. I will first address the standing issue and then proceed to the merits unless the Court would prefer otherwise. The plaintiffs do not have standing because they have not shown that any federal action has caused their harm, nor have they shown that this Court can redress the concrete harm that they assert, which is pumping that allegedly harms the Moabitace. For this basic reason, they do not have standing. All right. And you basically stand by your arguments in the reasoning of the district court? That's correct, Your Honor. I don't know if either of my colleagues have any questions on that. No questions. So if you want to proceed to your next issue. And Mr. Busty mentioned that there was a, you know, existential crisis around this biological opinion, and I would just like to discuss more about the unique nature of this biop and the memorandum agreement, and perhaps that can help the Court understand why Section 7 consultation occurred, even though the Federal Government does not have any authority to permit or administer pumping. This is true, but the government has the Endangered Species Act creates certain limitations here on what people can do, doesn't it? Certainly, Your Honor, but the Endangered Species Act requires Section 7 consultations when an action of the Federal Government may affect the species. Here, we're in a bit of a unique posture because the Federal Government doesn't have any ability to control groundwater pumping, and it was for that reason that it sought to negotiate with the parties that did have the right to pump in order to create an agreement that would promote Moapa-based conservation. It has an interest. It's involved. It has an interest. It has an interest, Your Honor, but it doesn't have any authority to control the pumping that is the ultimate harm of the dais. And for that reason, it sought to create this type of agreement. It was really one of the only tools available to it was to create an agreement that you had done nothing. Because if you had done nothing, could you be faulted legally? No, Your Honor. And that's precisely the, you know, this almost this lawsuit is somewhat consistent with the observation that no good deed goes unpunished. Here, the Federal Government tried to engage in proactive negotiations with the parties to create a framework in which conservation measures would be agreed to and implemented that go above and beyond what was legally required. From your perspective, would the Center for Biological Diversity have had any authority whatsoever to negotiate with the parties? I'm sorry, Your Honor. Could you repeat that? Would the appellants, would they have any authority to negotiate with the water authorities? Well, the appellants could lodge complaints before the state engineer. They're free to assert sort of public trust claims before the state engineer, but they have not done that. And instead, they chose to challenge this buy-up, which, in effect, finds that the federal participation in this memorandum of agreement, which effectively benefits the dace, doesn't cause jeopardy. And that is a completely reasonable finding, in our view, because the MOA only benefits the dace. It does nothing to harm the species. As well, any of the ultimate finding of the Fish and Wildlife Service, that its participation in the MOA, that is the federal action that was being analyzed, federal participation in the memorandum of agreement. So since federal participation only led to an agreement that helped the dace, its conclusion that no jeopardy would hurt the species was reasonable. So what you're saying is you didn't have to do that. Certainly, Your Honor. If you had done that, there would be they couldn't do anything about it. And so then you did it, and it didn't maybe solve every problem, but it was better for the dace. It was better than a world without the agreement, in our view. Yeah. I am troubled by the fact that it's a programmatic. Yeah, Your Honor. Could you comment to that? Yes, Your Honor. In fact, yeah. So it's a programmatic buy-up, and there are at least five biological opinions or four biological opinions that are tiered to it. But those buy-ups have to undertake their own separate effects analysis and reach their own no jeopardy conclusions. This programmatic buy-up does not govern the outcome of those analyses at all. What it does, and why the Fish and Wildlife Service undertook it, was to provide a landscape-level understanding of what was going on throughout the area, and that is consistent with federal government practice in all instances when biological opinions are undertaken, which is to say they undertake a landscape-level analysis, create a document that informs site-specific decisions. But those site-specific decisions are not governed necessarily by the programmatic. So it's not like precedent? No, Your Honor. It's not. What it is is additional information about the basins here. There's complex interactions, groundwater interactions, and this programmatic allows us to have that landscape-level understanding. But it doesn't govern. So, Ms. Robertson, your good deed was anticipating that it's programmatic, getting the parties together and coming up with a program of conservation, is that? That's correct, Your Honor. You know, it may be worth noting that there was one, the pipeline right-of-way for the pump test went across federal land. It's noted in our brief in a footnote. And that buy-up was completed in 2007 and tiered to this one. But that pipeline, which was required to do the pump test, which the state engineer had ordered, needed to go forward. And the Fish and Wildlife Service decided to first do a programmatic to understand the landscape-level effects and anticipation of a potential application for permission to go across federal land for the right-of-way pipeline, for the pipeline right-of-way. If there are no further questions, and since brevity is not a sign of weakness here, I can turn to my colleague, Mr. Feldman. I don't think we have any further questions. Thank you. Good morning. Good morning, Your Honors. May it please the Court. I am Murray Feldman, here today arguing on behalf of the Southern Nevada Water Authority and also Coyote Springs Investments. Just to bring the Court up to date on a couple of points, the pumping is not occurring at 16,000 acre-feet a year. My client, Southern Nevada Water Authority, is not pumping any water from the MX-5 well at this time. They do have some plans to resume later this month, but it's only a very small amount enough to replace the one CFS of the Jones Spring Riot that's been dedicated to in-stream flow uses for the days. There was a lot of Well, I think the concern is not what's happening now, necessarily. Right. I was responding to the appellant's point, Your Honor, that it authorized up to 16,000 acre-feet a year, but it didn't. And if there were to be subsequent pumping Well, it did. It didn't authorize the pumping. If there's the subsequent Federal actions, such as right-of-ways related to the pumping, that could be evaluated then at that time. It has been in the record in the Coyote Springs Transmission Pipeline Project subsequent biological opinion, which has an incidental take statement, has a quantification of take, and made the conservation measures enforceable. But the no-take, the no-jeopardy finding is based on the assumption that this full amount will be or can be used, is it not? Correct. But the context of the no-jeopardy determination for the service's entry into the MOA was based on a background of if there was pumping at the level of 60,000 acre-feet per year. In the appellant's argument, there was discussion about things may have been different if the Federal Government had asserted their water right, but what's important to understand is that the Fish and Wildlife Service's state-issued water right here is junior in priority date to SNWA's water right and Coyote Springs Investments' water right. And so really what happened as a result of the Memorandum of Agreement process was that a portion of the groundwater pumpers' rights were subordinated to the junior right, and it elevated the interest of the Federal Government's water right so that it could assert it if the flow levels got low enough. Those were the trigger levels. So it elevated the junior water right held by the Fish and Wildlife Service over some of the interests of the groundwater pumpers. So that, again, was a benefit to the days. That is not a case of they did not. So absent the MOA, that would not have been the case? Correct. The appellants also referenced that in the biological opinion it says there may be harm in certain instances or there may be effects. That's true, but under the Endangered Species Act, a harm or an effect is not the same as jeopardy. And the Section 7 inquiry here was whether or not it was likely to jeopardize the species, not whether there might be an effect. So the fact that the biological opinion recites that there is an effect or may harm at some of the days at some flow levels, that's not dispositive of the adequacy of the no jeopardy determination here. There was no incidental take statement. Correct. There was no incidental take statement because there was no authorization for take.  Your Honors, as consistent with the regulations here, which define incidental take as take that results from carrying out an otherwise lawful activity by the Federal agency, there was no take resulting from the conservation measures in the memorandum of agreement here. And also the requirement for an ITS in a biological opinion, it's required in those cases where the service concludes that an action and the resultant little I1, there has to be resultant incidental take, and that the service's conclusion that it will not violate the jeopardy prohibition, then an incidental take statement is required. But again, there's no resultant take here, so there was no need for an incidental take statement. The appellants also cited to the district court decision in CBD versus FWS in terms of the impact of a programmatic biological opinion and that if they could determine jeopardy, then there needed to be an incidental take statement, and this programmatic biological opinion here was controlling the subsequent decision making. But as Ms. Robertson has pointed out and as we point out in the intervener's joint reply brief at page 30, that situation is distinguishable. Those are based on the specific National Forest Management Act planning context, where there's Federal lands involved, there's statutory requirements that subsequent actions be consistent with the higher level plan actions, and there's no such requirements here. This is a very different context where you have non-Federal actors that are engaged in the pumping. I think that the district court correctly perceived, Your Honors, that CBD has challenged the wrong action here. As we've noted, it's those subsequent actions, if CBD had challenged them or looked at them, they have the requirements that they're looking for, so the relief that they seek is already in place in those subsequent biological opinions. So we'd ask, Your Honors, that the judgment of the district court be affirmed here. This case shows that the ESA process is working in this instance, and we ask that you let it continue to work. Thank you. Thank you. We're back to this issue of authorization versus allowing. And the claim is that the government, the Federal government, has no authority to control groundwater pumping. There is no authority to, in the sense of authorizing or permitting groundwater pumping. That's the purview of the state engineer and state groundwater rights law and regulation. That's certainly true. But the Fish and Wildlife Service, in this situation, where it is the owner and landowner of the wildlife refuge, as well as the overseer of the Endangered Species Act program, it has some ability to control the outcome in a groundwater pumping scenario. It can do so by asserting whatever water rights it has, and it can do so by finding that the action, even if it has a small part of the action, as it does here, could result in the jeopardizing. Well, but what if that's not their opinion? They could do so, but if they don't think that that's the right answer. Well, the question is whether they have some ability to control the groundwater pumping. And, yes, hypothetically, they have the ability to make a jeopardy determination. The fact that they didn't do so is the subject of this suit, but they do have the ability to do so. They could have done so here. That's a measure of control over groundwater pumping. So it's not simply a case of them having no ability to assert control over groundwater pumping. They have some ability to do so. Otherwise, this whole agreement becomes very puzzling. Why was it even done? There seems to be no purpose whatsoever. As for the federal water rights, they do appear to be junior water rights, but the service was giving up something. It wasn't our reading of the agreement that the agreement actually elevates these water rights to a more senior status. The very plain language of the agreement has the Fish and Wildlife Service saying, we will not assert our rights until the flows reach this low level. That's what it says. So up to that point, when they acknowledge harm to the days will be occurring, they say, we will not assert our federal water rights. Now, what effect the assertion of those federal water rights might have had, we don't know. The junior status may have rendered them relatively ineffective. That's true. The federal government appears also to have reserved water rights that exist on the basis of their land ownership, the establishment of the refuge. So I think it's not really accurate to say that the federal water rights make no difference here. The federal government gave up something. It provided some consideration in the situation. As for no good deed going unpunished, I don't question the motives of the other parties. There was a conservation motive here. That's a good thing. We question the details. That's what our role is here, and that's why we had to resort to litigation. The details that we felt weren't adequately protective of the days, the failure to establish more protective flow trigger levels at a higher level that the Fish and Wildlife Service's own scientists recommended. As for the programmatic nature of this biological opinion, I agree, it doesn't govern every subsequent biological opinion, but it does do what an upper-tier document should do. It sits at a higher level. It doesn't dictate the results of those, but it has a very strong influence over those subsequent biological opinions. And in the pipeline biological opinion that federal defense mentioned, that biological opinion followed precisely the conclusions in this one, that it adhered strictly to the determination that participation in the MOU would not jeopardize the continued existence of the Moapa days, that the conservation measures, the very same conservation measures we're talking about here, were adequate, and it followed those exactly. It didn't reanalyze. It didn't reconsider anything. And what was that prepared for? For what purpose was that prepared? That was for the pipeline over the Bureau of Land Management right-of-way that was necessary to conduct the pump test. So that's why that biological opinion, that teared off of this upper-level biological opinion, was prepared. The authority says that harm, that the conclusions of harm or some effect to the Moapa days in the biological opinion doesn't mean that there was jeopardy, but it does, in our view, mean that there was take, because harm is defined as take. If harm is occurring as a result of the triggers set, and despite the triggers and protective measures set in the memorandum of agreement, that's take. That needs to be quantified and set out in the biological opinion. The statement that there was no resultant take, well, there was resultant take. It just wasn't called resultant take in the biological opinion. You can't make it go away by calling it something else or just referring to it as harm that will be dealt with in subsequent project-level reviews when this is the point to deal with that harm. This is the point to deal with the information that is available, that information was known. The extent of the pumping was known. The likely effect on the spring habitat for the Moapa days was known. But the conclusion was that there would be harm, but no quantified take. And that's exactly the situation where there should be a quantification of take in an incidental take statement to allow for re-initiation of consultation. And thank you. I'm feeling there now. Thank you both for your argument. This matter, well, we will defer submission in this matter. And the parties are ordered to give us a status report on settlement at 60 days. Thank you. And then from there, depending on, obviously, if, you know, if you can request. I'm not saying open-endedly don't make requests for the rest of your life to settle this. But if you would be close and you need an additional, you know, period of time to sign things off, then if you request that and it's reasonable, we would be amenable to that. Or if it's – if settlement has broken down, then we'll resubmit the case and decide and we'll be prepared at this point to render a decision. Thank you both for traveling here. Thank you. Making a helpful argument today.
judges: Pratt, Schroeder, Callahan